L. Scott Coogler, United States District Judge
I. INTRODUCTION
Before the Court is Defendants' Motion to Strike Sullivan's' Declarations filed in Opposition to Summary Judgment (doc. 210); Sullivan's Consolidated Motion for Summary Judgment (doc. 235)[1] ; Defendants' Motion for Summary Judgment (doc. 269); and Sullivan's Motions to Strike (docs. 275 & 277). These Motions have been fully briefed and are ripe for decision. For the following reasons Defendants' Motion to Strike Sullivan's Declarations filed in Opposition to Summary Judgment is due to be GRANTED; Sullivan's Consolidated Motion for Summary Judgment is due to be GRANTED in PART and DENIED in PART; Defendants' Motion for Summary Judgment is due to be GRANTED in PART and DENIED in PART; and Sullivan's Motions to Strike are due to be DENIED as MOOT.
II. FACTUAL BACKGROUND [2]
Defendants operate approximately 158 Papa John's stores in Alabama, Louisiana, *1146 Texas, Mississippi, Tennessee, Illinois, Missouri, Ohio, Virginia, and Utah. As part of their business, Defendants employ delivery drivers who use privately owned automobiles to deliver pizzas or other foods on behalf of the Defendants. This case involves a minimum wage claim by Sullivan, who is a delivery driver formerly employed by the Defendants. Sullivan brought this case as a collective action under the Fair Labor Standards Act, ("FLSA"), 29 U.S.C. § 201, et seq. , alleging that Defendants failed to pay him and others similarly situated a minimum wage.
Central to the parties' dispute is the method Defendants use to reimburse drivers for the cost drivers incurred making deliveries on behalf of Defendants. Defendants' reimbursement policy is not based on a per-mile rate, but is calculated by multiplying a predetermined amount per delivery (called the "Mileage Rate") by the number of discrete delivery addresses to which a driver delivers. The Mileage Rate fluctuates according to local gas prices and also seeks to reimburse drivers for certain maintenance costs incurred such as oil changes and tire replacements. At the end of each delivery driver's shift, a "Checkout Report" is created by Defendants that includes the total amount of reimbursement due to the driver for the deliveries they made on their shift. The Checkout Reports do not include the total number of miles driven by the drivers each shift, nor do Defendants track or maintain records of delivery drivers' actual expenses.
Sullivan's minimum wage claims are based on the Department of Labor ("DOL") regulations made according to the rulemaking authority delegated to the DOL under the FLSA. Those regulations state that "the wage requirements of [the FLSA] will not be met where the employee 'kicks-back' directly or indirectly to the employer ... the whole or part of the wage delivered to the employee." 29 C.F.R. § 531.35. A kickback occurs when the cost to the employee of tools specifically required for the performance of the employee's work "cuts into the minimum or overtime wages required to be paid him under [the FLSA]." Id. Sullivan argues that Defendants' reimbursement method undercompensates the amount of actual expenses that Sullivan incurred delivering for Defendants, such that the kick-back given to Defendants reduces Sullivan's hourly wage below the federal minimum wage.
Subsequent to the filing of the parties' motions for summary judgment, the Supreme Court held in Epic Systems Corp. v. Lewis that otherwise valid arbitration agreements providing for the waiver of collective action procedures during arbitration must be enforced. --- U.S. ----, 138 S.Ct. 1612, 200 L.Ed.2d 889 (2018). Concerned that Epic Systems was possibly at odds with early holdings in relation to the class-wide-nature of this action, the Court ordered the parties to indicate their support or opposition to dismissal of this action in favor of individual arbitration. (See Doc. 283.) The parties responded, with Defendants supporting such dismissal and Sullivan initially opposing it. (See Docs. 287 & 88.) The Court set a hearing for the parties to offer arguments both in regards *1147 to the arbitration agreements and any decertification arguments.
In a motion on June 15, 2018, Plaintiffs reversed their earlier decision and indicated that they did not oppose dismissal of the conditionally certified class members so that they could participate in individual arbitration. (See Doc. 294.) Defendants likewise filed a Motion for Decertification on June 20, 2018. In light of these additional motions, the Court on June 22, 2018, decertified the class of Opt-in Plaintiffs, dismissing them without prejudice. The sole remaining plaintiff in this action is Sullivan himself. The Court thus addresses in this Memorandum of Opinion only the issues that directly implicate Sullivan, because the Court is without power to make any holding regarding the former Opt-in Plaintiffs.
III. STANDARD OF REVIEW
Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Id. A fact is "material" if it is one that "might affect the outcome of the case." Urquilla-Diaz v. Kaplan Univ. , 780 F.3d 1039, 1050 (11th Cir. 2015) (quoting Harrison v. Culliver , 746 F.3d 1288, 1298 (11th Cir. 2014) ). The trial judge should not weigh the evidence, but determine whether there are any genuine issues of fact that should be resolved at trial. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "considering all of the evidence and the inferences it may yield in the light most favorable to the nonmoving party." McGee v. Sentinel Offender Servs., LLC , 719 F.3d 1236, 1242 (11th Cir. 2013) (citing Ellis v. England , 432 F.3d 1321, 1325 (11th Cir. 2005) ). Further, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." Id. (citing Clark v. Coats & Clark, Inc. , 929 F.2d 604, 608 (11th Cir. 1991) ). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." Celotex Corp. v. Catrett , 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion. See Am. Bankers Ins. Grp. v. United States , 408 F.3d 1328, 1331 (11th Cir. 2005) ; Griffis v. Delta Family-Care Disability , 723 F.2d 822, 824 (11th Cir. 1984) ; see also 10A Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2720 , at 335-36 (1998) (footnote omitted).
IV. DISCUSSION
The parties have moved for summary judgment on over ten discrete issues. While some arguments are made only by Sullivan or Defendants, the central issues of this case are addressed in both parties' summary judgment briefs. In an attempt to create a coherent treatment of the parties' dispute, the Court first addresses the "core issues" surrounding the parties' dispute, wherein a grant of summary judgment in favor of Defendants would require dismissal of this action. After finding that the core of this action is not due to be dismissed, the Court then addresses additional issues raised by both sides.
*1148 1. MT. CLEMENS BURDEN SHIFTING
Perhaps more important than any other dispute, the parties both raise in their motions for summary judgment the applicability of burden-shifting scheme created in Anderson v. Mt. Clemens Pottery Co. to the claims in this action. 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). "In Mt. Clemens , the Supreme Court held that where the employer's records are inaccurate or inadequate, the employee has the burden to prove by way of just and reasonable inference that he in fact performed work for which he was improperly compensated. Once the employee has met his burden, the burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence." Jarmon v. Vinson Guard Servs., Inc. , 488 F. App'x 454, 457 (11th Cir. 2012) (citing Mt. Clemens , 328 U.S. at 687-88, 66 S.Ct. 1187.)
In order to trigger applicability of Mt. Clemens burden shifting, a Court must find that Defendants have not complied with the statutory recordkeeping requirements under the FLSA in regards to Sullivan's employment. This inquiry in turn requires the Court to determine what records must be retained and produced by the Defendants "in accordance with the requirements of § 11 (c) of the [FLSA]." Mt. Clemens , 328 U.S. at 688, 66 S.Ct. 1187. When making this determination, the Court disregards whether "the lack of accurate records grows out of a bona fide mistake as to whether certain activities or non-activities constitute work, [because] the employer, having received the benefits of such work, cannot object to the payment for the work on the most accurate basis possible under the circumstances." Mt. Clemens , 328 U.S. at 688, 66 S.Ct. 1187.
Section 11(c) of the FLSA, codified at 29 U.S.C. § 211(c), requires that:
Every employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him , and shall preserve such records for such periods of time, ...
(emphasis added). The base requirements of § 211(c) are for the employer alone. Section 211(c)"places on the employer the obligation of keeping accurate records of the hours worked by his employees, and the employer cannot transfer his statutory duty to his employees." Goldberg v. Cockrell , 303 F.2d 811, 812 n.1 (5th Cir. 1962).[3]
As a preliminary matter, the Court must address an argument that Defendants have repeatedly raised that it is Sullivan's failure to keep records of his actual expenses that is to blame for the void in the record, and not Defendants themselves. Defendants do not cite any authority for this argument, (see doc. 271 at 55-56), and appear to be making their argument on what they think the law should be. Sullivan's own recordkeeping is immaterial to the Mt. Clemens inquiry, which focuses on the employer. Goldberg , 303 F.2d at 812 n.1 ("[T]he employer cannot transfer his statutory duty to his employees.") The road Defendants wish to lead the Court down has long since been condemned, and the Court declines to examine "whose" documents are "whose":
Due regard must be given to the fact that it is the employer who has the duty *1149 under § 11(c) of the Act to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed. Employees seldom keep such records themselves; even if they do, the records may be and frequently are untrustworthy.
Mt. Clemens , 328 U.S. at 687, 66 S.Ct. 1187 (emphasis added).
That is not to say that Defendants must keep records of any and all expenses that Sullivan believes to be pertinent to his FLSA claims. Instead, the exact records to be retained by Defendants are provided by statute and DOL regulation. The parties appear to agree that the § 211(c) is ambiguous to the extent that it fails to specify the exact records that an employer must maintain. Both parties ask the Court to apply Chevron deference to the DOL's regulations interpreting § 211(c). See Josendis v. Wall to Wall Residence Repairs, Inc. , 662 F.3d 1292, 1299 (11th Cir. 2011) (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc. , 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ). The recordkeeping requirements at 29 C.F.R. §§ 516.2 & 516.6 appear to be the most relevant to the Court's inquiry.
Section 516.2 provides a list of various records that an employer, subject to the FLSA's minimum wage and overtime provisions, must retain. Those records include basic information such as the employee's name in full, home address, date of birth, sex, time of day, and day of week on which the employee's workweek begins. 29 C.F.R. § 516.2(a)(1)-(5).[4]
Sullivan identifies § 516.2(a)(10) as the specific recordkeeping requirement that Defendants have failed to comply with. This section requires Defendants to keep a record of "[t]otal additions to or deductions from wages paid each pay period including employee purchase orders or wage assignments. Also, in individual employee records, the dates, amounts, and nature of the items which make up the total additions and deductions, ..." Likewise, § 516.6(c) requires that employers must retain "All records used by the employer in determining the original cost, operating and maintenance cost, and depreciation and interest charges, if such costs and charges are involved in the additions to or deductions from wages paid."
There does not appear to be any binding precedent to answer the direct question on hand, which is whether Mt. Clemens burden shifting applies to Defendants' failure to keep records of the actual expenses that Sullivan incurred using his own vehicle as a violation of the recordkeeping requirements of §§ 516.2 & 516.10 to record all "deductions" from wages paid. Sullivan points to Caro-Galvan v. Curtis Richardson, Inc. as a sufficiently similar case to this action to support the claim that Sullivan is entitled to Mt. Clemens burden shifting for Defendants' recordkeeping omission. 993 F.2d 1500 (11th Cir. 1993). In Caro-Galvan , the plaintiffs were farm workers who brought suit under the FLSA for violation of the minimum wage provisions of § 206(a). The district court dismissed the plaintiffs' case after finding that plaintiffs had failed to submit sufficient evidence to show that the deductions that the defendant-employer had taken *1150 from the plaintiffs' paycheck for "board, lodging, or other facilities" under § 203(m) were unreasonable. Caro-Galvan reversed the lower court's Rule 41(b) dismissal, finding that the district court had improperly shouldered the plaintiffs with the burden of proof instead of determining that Mt. Clemens applied. Importantly, although Caro-Galvan ultimately found that Mt. Clemens burden shifting applied to farm workers' case, it was not explicit in what recordkeeping requirement the defendants failed to comply with. See id. at 1513-14.
Caro-Galvan did note that the defendant-employer had an obligation under § 516.27[5] to keep records substantiating all deductions from a worker's paycheck for "board, lodging, or other facilities" under § 203(m). Thus, although Caro-Galvan did not explicitly state such, it appears that the defendant-employers had failed to keep such detailed records of all "deductions" under § 516.27, and thus the plaintiffs were unable to show the deductions were unreasonable. Id. at 1514.
Section 516.27 differs materially from the recordkeeping obligations incumbent upon Defendants in §§ 516.2 & 516.6. In addition to reiterating an employer's duty to keep records of "deductions" from wages of employees under the general requirements of the FLSA, § 516.27(a) additionally requires that the employer "maintain and preserve records substantiating the cost of furnishing each class of facility," i.e., maintain records to substantiate the costs incurred which are later applied to an employee's wage as a "facility" deduction under 29 U.S.C. § 203(m). Section § 516.27(b) further requires than an employer maintain records showing on a workweek basis the deductions from a wage, if those deductions reduce the employee's remuneration below the applicable minimum hourly wage. In this way, § 516.27 requires more than just an employer's accounting of the deduction itself, but also that the employer "go on the record" with the exact costs that he believe substantiates that deduction.
Caro-Galvan is ultimately unhelpful because it dealt with the recordkeeping requirements under § 516.27 for "board, lodging, or facilities" deductions from wages and further, these deductions were for items provided to the employees by the employer. Sullivan's theory of an FLSA violation does not turn on "board, lodging, or facilities" deductions as defined under 29 U.S.C. § 203(m) ; he instead argues that he has been forced to kick back part of his wages as defined in 29 C.F.R. § 531.35. Sullivan does not allege, nor could he reasonably, that Defendants have failed to comply with § 516.27's explicit recordkeeping requirements. Sullivan argues that Defendants have failed to comply with §§ 516.2 & 516.6 by not recording the expenses incurred by Sullivan delivering pizzas. Neither of those cited regulations requires Defendants to record Sullivan's actual expenses. On its face § 516.2(a)(10) requires Defendants to record "[t]otal additions to or deductions from wages paid" and does not even mention the employee's own expenses. Section 516.6(c) is a closer call, as it requires an employer to retain in regards to "[r]ecords *1151 of additions or deductions from wages paid: (1) [t]hose records relating to individual employees referred to in § 516.2(a)(10) and (2) All records used by the employer in determining the original cost, operating and maintenance cost, and depreciation and interest charges, if such costs and charges are involved in the additions to or deductions from wages paid." § 516.6(c)(2). Section 516.6(c)(2) does not purport to require that employers keep records of each employee's expenses, but rather the methodology used to arrive at the additions or deductions from wages paid.
Sullivan additionally cite two other cases that ostensibly held that Mt. Clemens burden shifting could apply from an employer's failure to keep employee expense records under §§ 516.2 & 516.6. See Villalpando v. Exel Direct Inc. , No. 12-CV-04137-JCS, 2016 WL 1598663, at *6 (N.D. Cal. Apr. 21, 2016) ; Melgar v. CSk Auto, Inc. , No. 13-CV-03769-EMC, 2015 WL 9303977, at *9 (N.D. Cal. Dec. 22, 2015), aff'd , 681 F. App'x 605 (9th Cir. 2017). Despite Sullivan's representations to the contrary, neither Villalpando nor Melgar made such a holding based on §§ 516.2 & 516.6 alone. As clearly stated in Villalpando and Melgar , the application of Mt. Clemens burden shifting turned on the employers' failure to comply with state recordkeeping law. See Villalpando , 2016 WL 1598663, at *9 ("The Court also rejects [Defendant's] assertion that Mt. Clemens does not apply to employee reimbursement under California Labor Code section 2802."); Melgar , 2015 WL 9303977, at *9 ("But even if there is no statute that explicitly requires recordkeeping for business expenses, [California Labor Code] § 2802 requires reimbursement of all expenses, and, as interpreted by this Court, imposes an affirmative duty on employers to reimburse such expenses when it has knowledge thereof."). While not preclusive, Villalpando and Melgar 's decision to rely on state recordkeeping law rather than §§ 516.2 & 516.6 tends to show that those DOL regulations do not require an employer to record their employees' business expenses-but rather the "additions or deductions" from wages paid.
For his Mt. Clemens argument, Sullivan also relies on Arriaga v. Florida Pacific Farms, L.L.C. 's statement that "there is simply no legal difference between an employer requiring a worker to have the tools before the first day of work, requiring the tools to be purchased during the first workweek, or deducting the cost of the tools from the first week's wages." 305 F.3d 1228, 1237 (11th Cir. 2002). Sullivan argues that this statement somehow makes incumbent on Defendants the duty to track Sullivan's' actual expenses incurred operating his own vehicle. The quoted portion of Arriaga has nothing to do with recordkeeping obligations, and dealt with the interpretation of the calculation of a minimum wage violation.
Sullivan has not shown convincing authority to the Court that Mt. Clemens burden shifting should apply by reason of Defendants' failure to record Sullivan's actual expenses. Additions and deductions that Defendants have made from Sullivan's paychecks are not the same as expenses that Sullivan incurred in operating his vehicles. The DOL surely could have specified such, especially considering the overwhelming burden this would impose on employers such as Defendants to gather and correlate the data for the different expenses that each employee would incur. Indeed, § 516.27's referral to "board, lodging, or other facilities" shows that in the event the DOL wishes for lawyers to record specific costs, it will say so:
[an] employer ... shall maintain and preserve records substantiating the cost of furnishing each class of facility.... Separate records of the cost of each item *1152 furnished to an employee need not be kept. The requirements may be met by keeping combined records of the costs incurred in furnishing each class of facility, such as housing, fuel, or merchandise furnished through a company store or commissary.
29 C.F.R. § 516.27.
Other persuasive authority buttresses the Court's conclusion that Defendants are not required to record Sullivan's actual expenses. Responding to a letter requesting an opinion regarding cost reimbursement for uniforms provided to a tipped employee without charge that were damaged in a non-work related context, the DOL stated that:
We note that the provisions of 29 C.F.R. § 516.2(a)(10) require an employer to maintain, for a period of two years, records showing the total additions to or deductions from wages paid each pay period. Thus, records documenting any deductions from wages of employees for purchasing employer-required uniforms must be maintained. Similarly, records documenting any deductions from wages of employees for voluntarily purchasing additional uniforms in excess of the number provided, as discussed above, must also be maintained. However, if employees purchase excess uniforms on their own, rather than through the employer, no record of such private transactions need be kept under the FLSA.
Opinion Letter Fair Labor Standards Act (FLSA), 2008 WL 5483046, at *1, *3 (emphasis added). While not binding on the Court, it appears that the DOL's interpretation of 29 C.F.R. § 516.2(a)(10) is that where the employee incurs a cost on behalf of the employer, the employer need not record such private transactions.
Simple reference to Sullivan's expert report shows the insurmountable burden Sullivan's proposed recordkeeping standard would impose on employers. In determining reasonable estimates for the former Opt-in Plaintiffs' vehicle costs, Sullivan's expert Paul Lauria only gathered average cost data from one type of car from each class of common vehicles, i.e., truck, SUV, sedan, or compact. Nor does Paul Lauria even attempt to use data from the former Opt-in Plaintiffs themselves, as "standard methodology used within [his] industry does not rely on reports of costs actually incurred or reported after-the-fact by drivers." (Doc. 256-1 at 18.) According to Sullivan's own expert, it is not feasible or helpful to rely on a driver's report of his own costs.
Without clearer indication from the DOL, it does not appear that Defendants have violated recordkeeping requirements by failing to track Sullivan's actual expenses. Sullivan appears to argue that the finding that Mt. Clemens burden-shifting applies is a per se finding that representative testimony can be used. This is an overstatement. Tyson Foods, Inc. v. Bouaphakeo , --- U.S. ----, 136 S.Ct. 1036, 1049, 194 L.Ed.2d 124 (2016) held that the use of representative testimony in FLSA class actions does not live and die by the application of Mt. Clemens burden shifting. Ultimately, for Sullivan to use representative testimony in the form of an expert report, the Court must ask whether the experiences of a subset of employees can be probative as to the experiences of all of them. Said another way, the Court must determine whether the representative samples used by Sullivan could be "used to establish liability in an individual action." Tyson , 136 S.Ct. at 1046.
The Court's holding that Mt. Clemens burden shifting does not apply in this case does not mean that representational evidence cannot necessarily be used in this action. Tyson Foods 's holding on the use of representational evidence was not based on Mt. Clemens burden shifting alone, but *1153 more broadly on whether such evidence is reliable:
petitioner and various of its amici maintain that the Court should announce a broad rule against the use in class actions of what the parties call representative evidence. A categorical exclusion of that sort, however, would make little sense. A representative or statistical sample, like all evidence, is a means to establish or defend against liability. Its permissibility turns not on the form a proceeding takes-be it a class or individual action-but on the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action.
136 S.Ct. at 1046. Ultimately, Mt. Clemens burden shifting and the use of representational evidence are two different issues. Representational evidence is appropriate where FLSA class members are similar such that "each [former] class member could have relied on that sample to establish liability if he or she had brought an individual action. If the sample could have sustained a reasonable jury finding as to hours worked in each employee's individual action, that sample is a permissible means of establishing the employees' hours worked in a class action." Tyson Foods , 136 S.Ct. at 1046-47. While Sullivan may no longer take advantage of the "just and reasonable inference" standard, the finding that Mt. Clemens burden-shifting does not apply ultimately requires he proves his damages using the normal standard applied to FLSA minimum-wage violations.
2. SULLIVAN'S ARGUMENTS CONCERNING DEFENDANTS' REIMBURSEMENT RATE
Sullivan additionally argues that he is entitled to summary judgment on the issue of whether "Defendants used a vehicle-reimbursement methodology that is contrary to the law." (Doc. 235 at 60.) Sullivan primarily bases his argument on his interpretation of DOL Field Operations Handbook § 30c15, which according to him requires Defendants to either "track, record, and reimburse their employees' actual vehicle expenses incurred on the job, or (2) reimburse their employees at the IRS standard business mileage rate." (Doc. 235 at 62.)
DOL Handbook § 30c15 states in whole:
Car expenses: employee's use of personal car on employer's business.
In some cases it is necessary to determine the costs involved when employees use their cars on their employer's business in order to determine minimum wage compliance. For example, car expenses are frequently an issue for delivery drivers employed by pizza or other carry-out type restaurants.
(a)As an enforcement policy , the IRS standard business mileage rate found in IRS Publication 917, "Business Use of a Car" may be used (in lieu of actual costs and associated recordkeeping) to determine or evaluate the employer's wage payment practices for FLSA purposes. The IRS standard business mileage rate (currently 28 cents per mile) represents depreciation, maintenance and repairs, gasoline (including taxes), oil, insurance, and vehicle registration fees. In situations where the IRS rate changes during the investigation period, the applicable rates should be applied on a pro-rate basis.
(b) The IRS standard business mileage rate may be used in lieu of actual costs for FLSA purposes whether or not the employee will be able to take a deduction on his or her tax return for the business use of the employee's car.
(emphasis in original). There are primarily two issues the Court must address: (1) what level of deference § 30c15 is due to be given by this Court and whether Sullivan's interpretation of § 30c15 is supported *1154 by its text and the FLSA in general.
The first of these questions is relatively easy to answer. The Eleventh Circuit has held that the DOL Handbook as "[a]n agency's internal directive[ ] to its employees" is persuasive authority; it is not entitled to Chevron deference and is "without the force of law." Klinedinst v. Swift Investments, Inc. , 260 F.3d 1251, 1255 (11th Cir. 2001) ; see also Morgan v. Family Dollar Stores, Inc. , 551 F.3d 1233, 1275 (11th Cir. 2008) ; Kirkland Masonry, Inc. v. C.I.R. , 614 F.2d 532, 534 (5th Cir. 1980) ("Although federal agencies are bound by their own regulations, a simple administrative directive to agency employees does not suffice to create a duty to the public"). As an interpretation of its own regulations, the DOL Handbook is entitled to lesser Skidmore deference. See Skidmore v. Swift & Co. , 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). Under Skidmore , interpretations of "an agency charged with the mission of enforcing a particular statute, 'while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.' " Young v. United Parcel Serv., Inc. , --- U.S. ----, 135 S.Ct. 1338, 1351, 191 L.Ed.2d 279 (2015) (quoting Skidmore , 323 U.S. at 140, 65 S.Ct. 161 ). Nonetheless, "the weight of [the agency's] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors that give it power to persuade, if lacking power to control." Id. at 1352 (quoting Skidmore , 323 U.S. at 140, 65 S.Ct. 161 ).
Sullivan reads § 30c15 for the proposition that if Defendants did not record and pay Sullivan's actual costs incurred during delivery on behalf of Defendants, then Defendants must reimburse Sullivan at the IRS standard business mileage rate. The text of § 30c15, "the IRS standard business mileage rate ... may be used (in lieu of actual costs and associated recordkeeping) to determine or evaluate the employer's wage payment practices for FLSA purposes" does not support Sullivan's interpretation. Nowhere does § 30c15 require Defendants to record Sullivan's actual costs, the section instead makes a general reference to "associated recordkeeping." In this Opinion, the Court has already held the FLSA and DOL's regulations do not require employers to track employees' actual expenses incurred. To the extent § 30c15 purports to require employers to track their employees' actual expenses, it is not entitled to deference because it has no basis in the DOL's recordkeeping regulations. Nor does it make sense to require the Defendants to reimburse Sullivan at the IRS standard-as the Court has already held that an employer may either pay actual costs or use a reasonable approximation thereof. (See Doc. 197 at 14-21.) The IRS rate is arbitrary and has no logical tie to the ultimate question in a minimum wage case-whether Sullivan was paid the federal minimum wage taking into account reimbursements he received for vehicle expenses he incurred.
Even if Sullivan's interpretation was supported by the text of DOL Handbook § 30c15, which it is not, this interpretation is at odds with the DOL's regulations and the FLSA itself. No regulation or statute supports Sullivan's contention that if the Defendants do not keep records of Sullivan's actual costs or then Defendants' compliance with minimum-wage laws must be measured by the IRS standard business mileage rate. Defendants only have to pay Sullivan the minimum wage after deducting actual expenses and including reimbursements-not *1155 the IRS standard business mileage rate.
Sullivan cites a number of non-binding cases for his interpretation of DOL Handbook § 30c15, none of which are particularly persuasive. Zellagui v. MCD Pizza, Inc. relied on § 30c15 to hold that employers must either reimburse at the IRS rate or keep detailed records of employees' actual expenses. 59 F.Supp.3d 712, 716 (E.D. Pa. 2014). Zellagui did not examine the particular statutory or regulatory background relevant to § 30c15, but appeared to rely on § 30c15's interpretation of the FLSA without even recounting what the FLSA stated. Zellagui recognized that the IRS rate is per se unrepresentative of a local class's actual damages as "[t]he IRS figure is a national average of the cost of operating a motor vehicle." Id. at 716 (quoting Gattuso v. Harte-Hanks Shoppers, Inc. , 42 Cal. 4th 554, 565, 67 Cal.Rptr.3d 468, 169 P.3d 889 (2007) ). To that extent the IRS rate is unhelpful to showing Sullivan's actual damages or a reasonable approximation thereof.
Sullivan additionally cites Gattuso v. Harte-Hanks Shoppers, Inc. for his argument, but this case involved the interpretation of California minimum wage and recordkeeping requirements. Gattuso v. Harte-Hanks Shoppers, Inc. , 42 Cal. 4th 554, 561-70, 67 Cal.Rptr.3d 468, 169 P.3d 889 (2007). Gattuso 's parsing of California minimum wage law, which differs materially from the FLSA and the DOL's regulations, is hardly informative to the Court's task here. Additionally cited by Sullivan is Cornish v. Deli Mgmt., Inc. , but Cornish simply relied on Zellagui and Gattuso 's interpretation of § 30c15 without taking a fresh look at the regulations themselves. No. CV WMN-16-672, 2016 WL 5934077, at *3 (D. Md. Oct. 12, 2016).
Perrin v. Papa John's Int'l, Inc. , another case litigated by Sullivan's counsel but omitted from his argument in this section, correctly sums up this Court's parsing of the § 30c15 in light of DOL regulations and the FLSA:
The Court has reviewed the non-binding authority cited by Plaintiffs and finds that, at most, they suggest that the IRS standard business mileage rate may be a reasonable approximation of employee vehicle expenses. These authorities do not suggest that the IRS rate is the only reasonable approximation of such expenses. Nor have Plaintiffs cited any authority holding that an employer's failure to use the IRS rate in approximating expenses is per se unreasonable. Indeed, Plaintiffs' own expert offers an alternative rate that Plaintiffs contend is a reasonable, albeit conservative, approximation of their expenses for minimum wage purposes.
114 F.Supp.3d 707, 721-22 (E.D. Mo. 2015). To the extent Sullivan's motion for summary judgment asks the Court to hold that Defendants' reimbursement methodology is unlawful, that request is due to be DENIED.
3. DEFENDANTS' ARGUMENT THAT THE COURT SHOULD APPLY SKIDMORE DEFERENCE IN REGARDS TO 29 C.F.R. § 778
In their Motion for Summary Judgment, Defendants challenge the Court's earlier interpretation of 29 C.F.R. § 778 in it October 16, 2017 Memorandum of Opinion and Order where the Court ultimately determined that Sullivan could reasonably approximate expenses incurred on behalf of an employer. (See Doc. 197 at 14-21.) Defendants state that the Court erroneously applied Chevron deference in its interpretation of 29 C.F.R. § 778.217, where the proper standard to be applied was the more limited Skidmore deference. (Doc. 269-1 at 42.) The Court is puzzled by Defendants' argument as nowhere in its Memorandum of Opinion and Order did it state it applied Chevron deference to *1156 29 C.F.R. § 778.217. (See Doc. 197 at 18 ("Although not binding upon this Court because it is an interpretation, not a regulation, the Court finds § 778.217 to be highly persuasive, because the DOL's role in enforcing FLSA provisions and because § 778.217 was specifically referenced by § 531.32. See Young v. United Parcel Serv., Inc. , --- U.S. ----, 135 S.Ct. 1338, 1351, 191 L.Ed.2d 279 (2015).").) The Court cited Young v. United Parcel Service, Inc. , which dealt with the application of Skidmore deference to an EEOC interpretative regulation. The Court applied Skidmore deference.
4. DEFENDANTS' ARGUMENT CONCERNING THE BURDEN OF PROVING WHAT EXPENSES AN EMPLOYER MUST REIMBURSE
Defendants' next section, titled " 29 C.F.R. Section 778.217 Compared to Section 531.35" appears to address multiple issues surrounding the expenses Sullivan can include in his calculations to determine whether Defendants have violated the minimum wage provision of the FLSA. Defendants first argue that because Sullivan did not incur certain vehicle expenses "solely by reason of action taken for the convenience of his employer," under 29 C.F.R. § 778.217, that those expenses are not to be deducted from Sullivan's wages for the purposes of determining whether Defendants complied with the minimum wage provision of the FLSA. (Doc. 269-1 at 43.) Defendants state they are entitled to judgment as a matter of law to the extent Sullivan's Complaint can be construed as claiming a minimum wage violation in any FLSA workweek by virtue of expenses incurred "solely by reason of action taken for the convenience of his employer."
Defendants then inexplicably change their argument to 29 C.F.R. § 531.35, to discuss the "kickback" standard in that section. They argue under § 531.35 that "each cost allegedly incurred by ... Plaintiff must be analyzed to determine whether the cost was incurred for an employer's primary benefit. " (Doc. 269-1 at 44.) Defendants appear to be arguing two different standards should apply to determine whether certain vehicle expenses should be used to calculate minimum wage violations the "solely by reason of action taken for the convenience of his employer" under § 778.217 and the "primary benefit" analysis under § 531.35. At varying points in the section Defendants make generalized statements referring to "evidence" on the record that they believe supports their argument, but do not include any citations to the record or undisputed facts to support these statements.
The FLSA requires employers to pay their employees a minimum wage. 29 U.S.C. § 206. Under 29 C.F.R. § 531.35 :
"wages" [under 29 U.S.C. § 206 ] cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear." The wage requirements of the Act will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee. This is true whether the "kick-back" is made in cash or in other than cash. For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act.
(emphasis added). The Eleventh Circuit has held § 531.35"prohibits any arrangement that 'tend[s] to shift part of the employer's business expense to the employees *1157 ... to the extent that it reduce [s] an employee's wage below the statutory minimum.' " Ramos-Barrientos v. Bland , 661 F.3d 587, 594-95 (11th Cir. 2011) (quoting Mayhue's Super Liquor Stores, Inc. v. Hodgson , 464 F.2d 1196, 1199 (5th Cir. 1972) ).
It is notable that neither § 531.35 nor Ramos-Barrientos make use of the "primary benefits" test that Defendants ask the Court to adopt. It is only §§ 531.3 & 531.32, which further define the term "facilities" from 29 U.S.C. § 203(m), which make use of the term "primarily benefits." Specifically, section 531.3(d) states in pertinent part:
The cost of furnishing "facilities" found by the Administrator to be primarily for the benefit or convenience of the employer will not be recognized as reasonable and may not therefore be included in computing wages.
29 C.F.R. § 531.3(d)(1) (emphasis added). Section 531.32 likewise uses the "primary benefits" language in relation to the definition of "facilities":
It should also be noted that under § 531.3(d)(1), the cost of furnishing "facilities" which are primarily for the benefit or convenience of the employer will not be recognized as reasonable and may not therefore be included in computing wages.
29 C.F.R. § 531.32(c). Section 531.35 references the term "facilities" and directs the reader to refer to § 531.32(c) -but does not define a "kick-back" as "primarily for the employer's benefit."
Arriaga v. Florida Pacific Farms, L.L.C. bridges the connection between the "primarily benefits" requirement of §§ 531.3 & 531.32 with the generalized statement in § 531.35 that an employer cannot count as "wages" the amount the "employee 'kicks-back' directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee." 305 F.3d 1228, 1237 (11th Cir. 2002). Arriaga addressed whether employers of migrant workers violated minimum wage requirements under the FLSA by failing to reimburse workers for expenses relating to traveling to employers' farm and certain visa and recruitment costs. Id. at 1231-32. It began by noting that an employer is allowed to count as "wages" the reasonable cost of furnishing an employee with "other facilities" under 29 U.S.C. § 203(m). Id. at 1236. Because "other facilities" is not defined under the FLSA, Arriaga relied on the further definitions provided under 29 C.F.R. §§ 531.3 & 531.32. Id. Importantly in Arriaga , the expenses in dispute fell into the definition of "other facilities" under § 531.32(a) :
"Other facilities," as used in this section, must be something like board or lodging. The following items have been deemed to be within the meaning of the term: ...; transportation furnished employees between their homes and work where the travel time does not constitute hours worked compensable under the Act and the transportation is not an incident of and necessary to the employment.
29 C.F.R. 531.32(a) ; see also Arriaga , 305 F.3d at 1241 (analyzing expenses as "other facilities" under § 531.32 ). As stated above, both §§ 531.3 & 531.32 define "facilities" as expenses primarily for the benefit or convenience of the employer.
At the same time, Arriaga briefly mentions § 531.35-the dispositive section in the present case-for the proposition that "[i]f an expense is determined to be primarily for the benefit of the employer, the employer must reimburse the employee during the workweek in which the expense arose." Section 531.35 thus appears in Arriaga for the proposition that the violation occurs: "in any workweek when the cost of *1158 such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act." Arriaga , 305 F.3d at 1237. This is in fact the extent of Arriaga 's discussion of § 531.35, and the opinion quickly returns to the framework under § 203(m) and 531.32's definition of "other facilities." Arriaga appears to require that for an expense incurred by an employee to constitute a "kick-back" under § 531.35, it must be incurred for the primary benefit of the employer.
The issue the dicta in Arriaga creates in relation to § 531.35, and this Court faces now, is that the "primarily benefits" for provision of "other facilities" facially differs from the test stated in Ramos-Barrientos and Mayhue's Super Liquor Stores, Inc. for kickbacks under § 531.35, which does not look to whether an employer receives a primary benefit, but to whether payment by the employee " 'tend[s] to shift part of the employer's business expense to the employees.' " Ramos-Barrientos v. Bland , 661 F.3d 587, 594-95 (11th Cir. 2011) (quoting Mayhue's Super Liquor Stores, Inc. v. Hodgson , 464 F.2d 1196, 1199 (5th Cir. 1972) ). In fact, Ramos-Barrientos applies the "primarily benefits" test in part, but only when determining whether certain benefits liking housing and meals received by employees constituted "other facilities" under 203(m). 661 F.3d at 595.
The "expense-shifting" test first articulated in Mayhue's Super Liquor Stores, Inc. is better suited to the dispute here than the "primary benefits" test in Arriaga for a number of reasons. More importantly, because Mayhue's Super Liquor Stores, Inc. was decided earlier, its holding is binding upon Arriaga to the extent that the two standards conflict. Fanin v. U.S. Dep't of Veterans Affairs , 572 F.3d 868, 874 (11th Cir. 2009) ("[W]e are bound by the holdings of earlier panels unless and until they are clearly overruled en banc or by the Supreme Court." (quoting Swann v. S. Health Partners, Inc. , 388 F.3d 834, 837 (11th Cir. 2004) ) ). Mayhue more clearly addressed kick-backs under § 531.35 and did not include a discussion of "facilities." Section 531.35 itself provides that while a "wage" can be paid in cash or facilities, it constitutes a "kick-back" if the employee gives directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee. While Arriaga dealt with "other facilities," specifically the "transportation furnished employees between their homes and work," this action does not involve the provision of "other facilities" as defined under § 531.32(a).[6] Instead, this action deals with the provision by Defendants to Sullivan of wages, which Sullivan alleges are being kicked back to Defendants through Sullivan's payments for insurance, registration costs, vehicle depreciation, and repair costs.
*1159 Defendants argue the evidence establishes that "(1) some Plaintiffs did not own the vehicles used to deliver for a Defendant, (2) state laws required drivers to be insured and vehicles to be registered, (3) Plaintiffs paid for insurance and registration as part of their ordinary life, and (4) Plaintiffs paid insurance, registration, maintenance and repair costs for their primary benefit." (Doc. 269-1 at 44 (emphasis omitted).)[7] Viewed in the light most favorable to Sullivan, there are numerous issues of fact concerning the statements that Defendants argue they have established, and for that reason Defendants' Motion for Summary Judgment will be denied as to this issue.
Defendants have shown that some former Opt-in Plaintiffs did not in fact own the vehicles that they used to deliver pizzas. (See Id. ¶ 15 (purporting to list the former Opt-in Plaintiffs and other documents in the record which establish that the former Opt-in Plaintiffs do not own the vehicles used for pizza deliveries).) Defendants have likewise referenced statements by some former Opt-in Plaintiffs that finance companies required vehicle insurance, state law requires insurance and vehicles to be registered. (Id. ¶¶ 19-21, 25-27.) None of these facts are helpful in answering the dispositive question of whether Defendants have shifted part of their business expenses to Sullivan. Thus questions of fact remain as to whether these costs or some portion of these costs have been shifted from the employer to employees.
5. LACK OF RECORD EVIDENCE SHOWING MINIMUM WAGE VIOLATION
Defendants argue that summary judgement should be granted because Sullivan has failed to present any evidence that establishes violations of the FLSA's minimum wage provision. Defendants state:
No Plaintiff has disclosed, and there is no record evidence that would establish with regards to each Plaintiff for each workweek in which each Plaintiff alleges a minimum wage violation: (1) the number of hours worked by each Plaintiff, (2) the wages paid to each Plaintiff, (3) the reimbursement provided to each Plaintiff, and (4) the expenses allegedly incurred by each Plaintiff for a Defendant's primary benefit. On this basis alone, each Plaintiff's FLSA minimum wage claim(s) must be dismissed.
(Id. at 41.) Defendants do not develop this argument, nor do they include citation to any controlling or precedential authority on their failure-of-proof argument.
Sullivan relies on the report of his vehicle-costing expert, Paul Lauria, which used a representative model of the former class members and approximation to establish that Defendants failed to pay a minimum wage. In light of Tyson Foods , the proper inquiry before the Court is whether the report is representative enough to be used by Sullivan individually:
One way for respondents to show, then, that the sample relied upon here is a permissible method of proving classwide liability is by showing that each class member could have relied on that sample to establish liability if he or she had brought an individual action. If the sample could have sustained a reasonable jury finding as to hours worked in each employee's individual action, that sample is a permissible means of establishing *1160 the employees' hours worked in a class action.
136 S.Ct. at 1046. The issue of whether this report is so representative as to be usable in proving Sullivan's individual claim is not before the Court.[8] Defendants take too-narrow of a view of the use of class-wide testimony to establish liability, apparently arguing that it may never be used to show liability. Defendants' argument has no basis in the Federal Rules of Evidence or in Tyson Foods.
Sullivan's report creates a dispute of material fact as to whether Defendants violated the FLSA by failing to pay Sullivan the minimum wage. Defendants' reimbursement to delivery drivers is done on a per-delivery basis. Sullivan nonetheless calculates that, for example, in 2016, Defendants' average annual per-mile reimbursement rate for its drivers was $ 0.27. Sullivan's expert Paul Lauria estimates that the average costs incurred by former class members delivering pizzas for Defendants in 2016 was $ 0.40 per mile. The per-mile difference in the Defendants' reimbursement, with what Sullivan's expert estimates was the actual cost incurred was $ 0.13. Sullivan, based on the data contained in Defendants' Checkout Reports, has calculated an average of sixteen (16) miles driven per hour worked. Multiplying the per-mile cost the former Opt-in Plaintiffs incurred, on average, with the amount of miles driven in an hour yields an average unreimbursed cost incurred by the former Opt-in Plaintiffs of $ 2.08 per hour-which in terms of the FLSA is the kickback allegedly given to Defendants.
To determine whether this arrangement violates the FLSA minimum wage provision, the Court must then subtract the kickback amount from the per-hour wage given to drivers. According to Sullivan, the highest-paid delivery driver received $ 8.20 per hour, although most delivery drivers received much less. Subtracting the average kickback amount, $ 2.08, from the highest pre-kickback hourly wage reveals an actual hourly wage of $ 7.12 per hour. This amount is lower than the current federal minimum wage of $ 7.25 per hour. This calculation does not take in to account that the vast majority of the former Opt-in Plaintiffs made only the federal minimum wage. The Court notes that while the parties offered argument on the sufficiency of evidence to show a class-wide violation, neither party offered calculations or argument to Sullivan specifically. The Court cannot assess whether Defendants' payments to Sullivan violated the FLSA, because the arguments and evidence are not properly before it.
Defendants do not interact with Sullivan's damages calculations, but generally object to his use of expert testimony. They state that "[Sullivan] point[s] to no underlying admitted or admissible evidence that supports the purported conclusions" contained in Sullivan's report. (Doc. 258 at ¶¶ 5, 7, 8, 9, 10.) Defendants do not specify which conclusions in the report are not supported by admissible evidence. Nor does it matter that Paul Lauria's report is unsworn, as the Eleventh Circuit has held that parties' exhibits may be considered *1161 for purposes of pretrial rulings so long as they can be reduced to admissible form at trial. McMillian v. Johnson , 88 F.3d 1573, 1584 (11th Cir. 1996). Summary judgment is not due to be granted to Defendants at this time.
6. LACK OF RECORD EVIDENCE TO ESTABLISH DAMAGES
Along with Defendants' argument above that Sullivan has failed to establish liability, Defendants also argue that summary judgment is due to be granted because Sullivan has "not disclosed damages under [ Federal Rules of Civil Procedure 26 ], and the record does not contain evidence of damages as to each workweek in which each [former Opt-in Plaintiff] claims damages." (Doc. 269-1 at 48.) Defendants' argument that Sullivan must prove damages "by the workweek," which they have repeated throughout this litigation, is troubling, because the data Defendants kept in their Checkout Reports is not by the workweek but biweekly. (See Doc. 279-1 (data in Defendants' Checkout Reports is stored biweekly).) Defendants' storage of this data, or Defendants' parent-company PJI International, Inc.'s storage, facially fails to comply with the recordkeeping requirements of 29 C.F.R. § 516.2(a)(7), which requires:
(7) Hours worked each workday and total hours worked each workweek (for purposes of this section, a "workday" is any fixed period of 24 consecutive hours and a "workweek" is any fixed and regularly recurring period of 7 consecutive workdays)....
Although Sullivan does not specifically raise this argument in regards to Mt. Clemens burden shifting, Defendants' failure to keep weekly records of its drivers' hours is likely in violation of their recordkeeping obligations. The Court cannot now fault Sullivan for not being able to prove weekly violations when Sullivan does not have the needed information that Defendants were obliged to retain under law. To the extent that Sullivan must rely on the burden-shifting regime of Mt. Clemens , including the showing of hours worked by a "just and reasonable inference" because of Defendants' failure to keep weekly timesheets, he is so entitled.
Defendants also make an argument relating to "interrogatory responses," that are blank or incomplete. The Court has already dismissed a number of former Opt-in Plaintiffs for failure to respond to Defendants' interrogatories. (See Doc. 232, 262.) Obviously, to the extent that Sullivan himself "does not know" a specific claimed expense, no jury could base an award of damages on that interrogatory response.
Defendants then make the converse argument, "[t]o the extent [the former Opt-in] Plaintiffs' interrogatory answers reflect a "weekly" cost incurred, there is no evidence (and no allegation) that the amount reported is an actual amount expended or an estimation of each week's expenses incurred." The former Opt-in Plaintiffs' interrogatory answers constitute evidence, and Defendants do not explain why such answers are insufficient. Defendants wrote the interrogatory request for costs incurred, so they can hardly fault the former Opt-in Plaintiffs for responding to Defendants' subpoena and attempting to use that information.[9] The Court does not understand Defendants' argument that the former Opt-in Plaintiffs' attested to response to the interrogatory is not itself evidence.
7. DEFENDANTS' SECOND, THIRD, AND FOURTH DEFENSES
Sullivan asserts that Defendants have failed to show entitlement to specific affirmative *1162 defenses raised in Defendants' Answer. Sullivan moves for dismissal of Defendants' second, third, and fourth affirmative defenses.
A. SECOND DEFENSE: SECTION 10 OF THE PORTAL TO PORTAL ACT
Defendants' Second Affirmative Defense is under Section 10 of the Portal to Portal Act, 29 U.S.C. § 259. (Doc. 121 at 17.) Section 259 provides a good-faith defense that bars actions for violations of the minimum wage provisions of the FLSA if the employer "pleads and proves the act or omission complained of was (1) taken in good faith and was (2) in conformity with and (3) in reliance on a written administrative interpretation by a designated agency [under § 259(b) ]." Cole v. Farm Fresh Poultry, Inc. , 824 F.2d 923, 926 (11th Cir. 1987). The agency designated to provide interpretations of the FLSA is the Administrator of the Wage and Hour Division of the Department of Labor. Id. ; see also 29 U.S.C. § 259(b). An employer's good faith is not enough for the defense provided in § 259(a) to apply, nor is "an employer's actual reliance upon his own incorrect interpretation of a vague and general administrative guideline." Cole , 824 F.2d at 927. Thus, an employer cannot find relief under § 259 simply by showing that it relied on "general administrative guidelines" that provide "no opinion regarding the employer's particular situation." Id. at 928.
It is clear that Defendants do not qualify for this exemption, because in determining their compliance with the FLSA minimum wage requirements they did not rely on any specific interpretive guidance from the DOL Wage and Hour Division. Steven Saunders ("Saunders"), Defendants' 30(b)(6) representative, admitted that Defendants "did not rely on anything specific [in the DOL regulations] because it's all up to interpretation." (Doc. 235-4 at 13-15.) He likewise admitted that "[t]here's no specific guidance on reimbursements other than for anything the employees come out of pocket for primary benefit of the employer that should be reimbursed." (Doc. 235-4 at 15-16.)
Rather than argue reliance on a specific DOL interpretation, Defendants argue in their Response in Opposition that they relied on general DOL regulations including 29 C.F.R. §§ 531.32, 531.35, and 778.217. Defendants do not cite to any specific interpretation that purports to address their situation, and repeat the same argument expressly rejected in Cole . See 824 F.2d at 927 ("[A]n employer's actual reliance upon his own incorrect interpretation of a vague and general administrative guideline" is not sufficient for the affirmative defense under § 259 to apply.); id. at 929 (A Section 259 defense is insufficient where administrative guidance "left individual employers to their own devices in determining compensable time under all the particular circumstances not specifically mentioned as examples in the guidelines."). Cole 's dispositive language requires that an administrative interpretation must provide "a clear answer to the particular situation"-Defendants' citation to the general agency regulations is inadequate. Defendants' argument that it relied on these specific regulations is further contradicted by Saunders' testimony where he admitted during his deposition that he did not rely on any specific regulation because it "is all up to interpretation."
Even if Saunders attempted to rely "in good faith" upon the cited regulations, as Defendants argue he did, good faith reliance on general regulations is not enough for a § 259 defense. Id. at 927. While Defendants argue that there continues to be genuine issues of fact, they only cite parts of Saunders' deposition testimony showing that he attempted to create a *1163 reimbursement policy "in good faith." (Doc. 235-4 at 12, 22, 29.) Saunders' good faith reliance is insufficient to establish a § 259 defense. Therefore, Sullivan's motion for summary judgment on Defendants' second affirmative defense is due to be GRANTED.
B. THIRD DEFENSE: SECTION 11
Sullivan also moves for summary judgment on Defendants' third affirmative defense under Section 11 of the Portal to Portal Act, 29 U.S.C. § 260. Section 260 provides a partial defense to the penalty provided under 29 U.S.C. § 216(b), which states that an employer must pay an employee's unpaid minimum wage and an additional equal amount as liquidated damages. "[I]f the employer shows to the satisfaction of the court that the act or omission giving rise to [the violation] was in good faith and that [it] had reasonable grounds for believing that [the] act or omission was not a violation[,] ... the court may, in its sound discretion, award no liquidated damages." 29 U.S.C. § 260 ; see also Spires v. Ben Hill Cty. , 980 F.2d 683, 689 (11th Cir. 1993) ("[L]iquidated damages are mandatory absent a showing of good faith."). This good-faith defense to liquidated damages requires "an employer [to] show that it acted with both objective and subjective good faith." Meeks v. Pasco Cty. Sheriff , 688 F. App'x 714, 717 (11th Cir. 2017) (quoting Rodriguez v. Farm Stores Grocery, Inc. , 518 F.3d 1259, 1272 (11th Cir. 2008) ). Spires reiterated the test for a § 260 defense:
An employer who seeks to avoid liquidated damages bears the burden of proving that its violation was "both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict." An employer who knew or had reason to know that the FLSA applied, could not establish good faith as a defense. Thus, the district court's decision whether to award liquidated damages does not become discretionary until the employer carries its burden of proving good faith. In other words, liquidated damages are mandatory absent a showing of good faith.
980 F.2d at 689 (quoting United States v. McKennon , 814 F.2d 1539, 1539 (11th Cir. 1987) ).
The question the Court must therefore consider is whether a reasonable factfinder could determine that the Defendants acted in good faith and had reasonable grounds for believing that they were not violating the FLSA in crafting their driver-reimbursement policy. See 29 C.F.R. § 790.22(b) ("The conditions prescribed as prerequisites to ... an exercise of discretion [to not award liquidated damages] by the court are two: (1) The employers must show to the satisfaction of the court that the act or omission giving rise to such action was in good faith; and (2) he must show also, to the satisfaction of the court, that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act."). In reviewing the same Saunders deposition testimony discussed in the Section 10 defense section above, it is clear that there is a dispute of material fact as to the good faith shown by Defendants in crafting the driver-reimbursement policy. Sullivan argues at length concerning a "reliance on counsel" defense; Defendants in their Response in Opposition raised no such defense. Additionally, Sullivan argues that the Section 11 defense must fail because the Defendants cannot show entitlement to Section 10 defense. However, different standards apply to the two defenses.
Defendants point to Saunders' statements that "the intent of our reimbursement program was to reimburse for any direct cost that the employee had, reimburse *1164 expenses out of pocket." (Doc. 235-4 at 14.) According to Saunders, Defendants tried to comply with their interpretation of the DOL regulations to reimburse their drivers for costs incurred. Whether Defendants' attempt was in good faith and whether Defendants had reasonable ground for believing they complied is a question that is premature for summary judgment. (Doc. 271 at 41 (arguing the liquidated damages issue as "unripe" until determination of liability has been made).)[10] Sullivan has not shown that Defendants' third affirmative defense should be dismissed.
C. FOURTH DEFENSE: THE DE MINIMIS DEFENSE
Sullivan also asks that the Court dismiss Defendants' fourth affirmative defense, which Defendants characterize as the "the FLSA's de minimis defense with regard to each workweek worked by each Plaintiff during the statutory recovery period." (Doc. 121 at 17.) Generally speaking, the de minimis defense is set forth in 29 C.F.R. § 785.47, which states in relevant part:
In recording working time under the Act, insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are de minimis. ( Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 [66 S.Ct. 1187, 90 L.Ed. 1515] (1946) ) This rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities....
"When applying the de minimis rule to otherwise compensable time, the following considerations are appropriate: '(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work.' " Burton v. Hillsborough Cty. , 181 F. App'x 829, 838 (11th Cir. 2006) (quoting Lindow v. United States , 738 F.2d 1057, 1063 (9th Cir. 1984) ).
Defendants in their Response argue that summary judgment is inappropriate because Sullivan has not proved violations of the FLSA minimum wage provision by the workweek. They appear to assert that the de minimis defense does not only apply to failure to pay for uncertain and indefinite minute periods of time worked but also for "trivial" failures to pay a minimum hourly wage for the correct number of hours worked. (Doc. 271 at 44 ("[ 29 C.F.R. § 785.47 ] is not the basis for the de minimis defense under the FLSA (the regulation itself points to Mt. Clemens ); it is but a discrete regulatory example of a de minimis defense. Here, [Sullivan] do[es] not challenge (or offer evidence of) the hours worked in any workweek or the wages paid for those hours worked.").) Defendants confuse the evidentiary burden that lies with Sullivan to show a general FLSA
*1165 violation, with an affirmative defense that applies notwithstanding Sullivan's carrying his initial burden but where the failure to pay the minimum hourly wage resulted from uncertain and indefinite minute periods of time.
Defendants do not cite any authority for their novel take on the de minimis defense. While not binding on this Court, at least one other district court faced with Defendants' argument found no basis in law to support it. See Wagner v. ABW Legacy Corp, Inc. , No. CV-13-2245-PHX-JZB, 2016 WL 880371, at *16 (D. Ariz. Mar. 8, 2016) ("Defendant's 'de minimis ' argument does not establish that Defendant is entitled to summary judgment. Defendant does not cite to any authority to support the contention that it can escape paying shortfalls in minimum wage payments because the shortfalls are 'de minimis. ' Further, Defendant does not address any of the three factors it identifies as part of the de minimis analysis, nor is there sufficient evidence before the Court to assess these factors."). As with the defendants in Wagner , Defendants appear to raise a de minimis defense for their possible failure to pay an hourly rate at or above the federal minimum wage. The de minimis defense is only meant for instances where an employer has failed to compensate an employee for a small, hard-to-calculate period of time, not where the time the employee worked is certain but the employer's hourly rate is below the minimum wage.
Defendants repeat that the Sullivan's challenge to the de minimis defense is premature, as they have for each affirmative defense. They ask the Court to wait to consider this defense only if it finds that Defendants have violated the FLSA minimum wage provision. Normally whether a quantum of work is de minimis is a fact question for the jury. Mt. Clemens , 328 U.S. at 692, 66 S.Ct. 1187. However, there is no need for the Court to forbear deciding this issue as Defendants' articulation of their de minimis theory has no basis in the FLSA or the DOL's regulations. Regardless of Defendants' FLSA liability, the defense-as Defendants have articulated it-does not exist. Therefore, Sullivan's motion for summary judgment on the issue of Defendants' second affirmative defense is due to be GRANTED.
8. DEFENDANT DOUGLAS STEPHAN'S INDIVIDUAL LIABILITY
Sullivan next argues that in addition to the named corporate Defendants, who actually employed Sullivan, Defendant Stephens is individually liable for the FLSA violations of the corporate Defendants. The FLSA creates a private right of action against any "employer" who violates the FLSA's minimum-wage or overtime provisions. 29 U.S.C. § 216(b). The Act defines the term "employer" broadly to include "both the employer for whom the employee directly works as well as 'any person acting directly or indirectly in the interests of an employer in relation to an employee.' " Josendis , 662 F.3d at 1298 (quoting 29 U.S.C. § 203(d) ). Under this authority, the Eleventh Circuit has held that "a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." Patel v. Wargo , 803 F.2d 632, 637-38 (11th Cir. 1986) (quotation omitted). "[T]o support individual liability, there must be control over 'significant aspects of [the company's] day-to-day functions, including compensation of employees or other matters in relation to an employee.' In other words, while control need not be continuous, it must be both substantial and related to the company's FLSA obligations." Lamonica v. Safe Hurricane Shutters, Inc. , 711 F.3d 1299, 1314 (11th Cir. 2013) (quoting *1166 Alvarez Perez v. Sanford-Orlando Kennel Club, Inc. , 515 F.3d 1150, 1160 (11th Cir. 2008) ).
The parties largely agree on Defendant Stephens' status in relation to the other Defendant-entities. Defendant Stephens is the President and CEO of all other Defendants, and is at the top of the management hierarchy for those entities. (See Doc. 235 ¶¶ 29-30; Doc. 271 at 7.) He "establishes current and long-range objectives, plans, and policies," manages and directs Defendants towards those objectives. (Doc. 235 ¶¶ 34-35; Doc. 271 at 8.) He also reviews the operating results of Defendant entities and "takes steps to ensure that appropriate measures are taken to correct unsatisfactory results." (Doc. 235 ¶ 38; Doc. 271 at 8.) Defendant Stephens also had control over wages and reimbursements of the Defendants entities, and was one of the designers of Defendants' reimbursement policy. (Doc. 235 ¶¶ 40-41; Doc. 271 at 8.) In sum, Defendant Stephens is involved in the day-to-day operation of the Defendant entities with respect to their FLSA obligations.
Defendants do not contest the facts stated above, but raise novel arguments which have no basis in applicable FLSA precedent. Defendants state that "[f]or [Defendant] Stephens to be liable to each Plaintiff under the FLSA, each Plaintiff must prove that Stephens was that Plaintiff's employer under the FLSA" and that while Defendant Stephens had control over wages and Defendants' reimbursement, there is "no record evidence that Stephens set the actual reimbursement rate for [Sullivan]." (Doc. 271 at 69.) There is record evidence that Defendant Stephens had control over wages and Defendants' reimbursement policy, as the Defendant entities' corporate representative directly testified that Stephens created the rate with his vice presidents:
Q: Who c[ame] up with the reimbursement methods?
A: I did.
Q: For all of the operating entities?
A: Yes. Again, that was a collaboration between myself, Bill Green, and Doug [Defendant Stephens], but I did the majority of the work.
(Doc. 235-3 at 42.) Green and Saunders were Stephens' subordinates. (See id. at 25.) Stephens approved specific reimbursement methodologies "in detail." (Id. at 116; see also id. at 109.) These reimbursement methodologies were used for Sullivan. Defendant Stephens is an employer because under Lamonica he exercised final and detailed "control over significant aspects of [the company's] day-to-day functions, including compensation of employees...." 711 F.3d at 1314 (quotation omitted). Alvarez Perez 's archetypical example of corporate officer who is also an employer under the FLSA rings particularly true: Defendant Stephens "held [Defendant entities'] purse strings, guided their policies, could authorize compliance with the FLSA, solved major problems, and had 'ultimate control over wages.' " 515 F.3d at 1161 (quoting Donovan v. Grim Hotel Co. , 747 F.2d 966, 972 n.7 (5th Cir. 1984) ).
Defendants also utilize a narrow-reading of the "day-to-day functions" language of Lamonica to argue that Defendant Stephens was not involved in "store-level" activities and thus cannot be an employer. Defendants misconstrue Lamonica , which rejected the very argument Defendants make. It is immaterial whether there is a large company hierarchy below Defendant Stephens, as long as he sets and controls the day-to-day compliance of the Defendant entities with their FLSA obligations. Lamonica , 711 F.3d at 1313 ("[S]uch control need not be proved directly. For example, the jury may infer such control from the exercise of general supervisory powers or the exercise of control over other employees.") There is no dispute of *1167 material fact that Defendant Stephens is an "employer" as understood in 29 U.S.C. § 203(d). Defendants' Motion for Summary Judgment as to Defendant Stephen's liability is due to be DENIED.
9. SINGLE / JOINT EMPLOYER STATUS
Sullivan additionally argues that he is entitled to a judgment as a matter of law that Defendants are either (1) a "single integrated enterprise" or (2) joint employers for the purposes of joint and several liability as between all Defendants.
A. SINGLE ENTERPRISE LIABILITY
Sullivan contends that single enterprise liability applies to his FLSA minimum wage claims against Defendants for the purposes of imputing joint and several liability between all Defendants, regardless of which Defendant employed him. Sullivan cites multiple cases for this proposition, all of which deal with joint and several liability of employers under Title VII. (See Doc. 235 at 76.) As Defendants point out, Sullivan does not cite the applicable controlling standard for single enterprise liability FLSA cases in Patel v. Wargo , 803 F.2d 632 (11th Cir. 1986), which explicitly held that there is no single enterprise liability under the FLSA. In Patel , the plaintiff contended that the defendant-corporations were a single "enterprise" under 29 U.S.C. § 203(r) and should be jointly and severally liable for underpayment to all employees of the constituent corporations. Id. at 635. The Eleventh Circuit conclusively rejected the "single enterprise" argument, noting that while showing that two entities constitute an enterprise can be the first step in establishing coverage under the FLSA, coverage and liability are not the same. According to Patel :
There is no case holding that the individual entities which make up an enterprise should be jointly and severally liable for another entity's employees solely because they are members of the enterprise. In other words, there is no case which holds that the analysis of liability under the FLSA is the same as the analysis of the existence of an enterprise under the FLSA. We hold that the two analyses are and should be different.
Id. at 635. The Eleventh Circuit has reified Patel as recently as 2011. Cornell v. CF Ctr., LLC , 410 F. App'x 265, 267 (11th Cir. 2011). Thus, Sullivan's single enterprise argument fails as a matter of law.
Sullivan has cited and quoted other parts of Patel in his single enterprise argument, (doc. 235 at 75-76), indicating his awareness of the controlling case directly adverse to his position. Counsel should be aware of their duty under Federal Rule of Civil Procedure 11(b)(2) to ensure their representations to the Court are warranted by existing law.
B. JOINT EMPLOYER LIABILITY
Sullivan's argument in the alternative is that Defendants constitute "joint employers" under the FLSA such that they are jointly liable to all employees. The FLSA defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). An entity "employs" a person under the FLSA if it "suffer[s] or permit[s]" the individual to work. Id. § 203(g). An employee may have more than one employer, and "whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act depends upon all the facts in the particular case." 29 C.F.R. § 791.2(a). A joint-employment relationship will generally be found to exist in a situation:
Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, *1168 is controlled by, or is under common control with the other employer.
Id. § 791.2(b)(3) (footnotes omitted). In the Eleventh Circuit, courts generally analyze whether Defendants are joint employers under the FLSA using an eight-factor test. See Layton v. DHL Exp. (USA), Inc. , 686 F.3d 1172, 1178-81 (11th Cir. 2012) ; Freeman v. Key Largo Volunteer Fire & Rescue Dep't, Inc. , 494 F. App'x 940, 943 (11th Cir. 2012). Those factors are:
(1) the nature and degree or control of the workers; (2) the degree of supervision, direct or indirect, of the work; (3) the power to determine the pay rates or the methods of payment of the workers; (4) the right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; (5) preparation of payroll and the payment of wages; (6) ownership of facilities where work occurred; (7) performance of a specialty job integral to the business; and (8) investment in equipment and facilities.
Layton , 686 F.3d at 1176. The existence of a joint-employment relationship "depends on the economic reality of all the circumstances" and whether those circumstances demonstrate economic dependence. Id. at 1177.
Sullivan does not make any argument using the eight factors supplied by Layton , but appear to make a general argument according to the language of § 7912(b)(3) that Defendants are not "completely dissociated" and "share control" of employees. (See Doc. 235 at 82.) The arguments Sullivan marshals do not address many of the Layton factors except tangentially. Nor do Defendants make any arguments according to the Layton factors or even the controlling regulation, and instead generally asserts that "[t]here is virtually no record evidence that identifies which operating company employed which [employee]." (Doc. 271 at 67.)[11] As neither side has properly presented undisputed facts to support the existence or absence of the Layton factors, it is not appropriate for the Court to make a dispositive holding as to Defendants' joint employer status at this time. Rather than speculate as to these factors, the Court denies summary judgment on this issue.
On the other hand, it is unclear whether Defendant PJ United is an "employer" under the FLSA. During his deposition, Saunders directly stated "PJ United isn't an operating company," (doc. 235-3 at 14), that PJ United is not a franchisee of Papa John's, (id. at 26), does not write checks, (id. at 43), and does not have any employees (id. at 50) ("Q: If you go down the page further it says, PJ United, Inc. Does PJ United, Inc., have any employees? A. No."). Defendants have specifically raised this issue in their Response in Opposition, and have asked the Court to dismiss PJ United because it is not an employer. Defendants cannot raise new arguments in opposition to summary judgment, and thus the Court declines to make a holding on PJ United's employer status.
10. TIP CREDITS
Sullivan moves for entry of summary judgment on the issue of the use of Sullivan's delivery tips to meet the minimum wage requirements in 29 U.S.C. § 206. Although Sullivan has devoted a significant portion of his Motion for Partial Summary Judgment on this issue, Defendants have not responded or otherwise opposed Sullivan's arguments. To the extent that the Court understands Sullivan's argument, his motion is due to be granted in that the tips Sullivan received in excess *1169 of the tip credit amount cannot be used to "offset" Defendants' minimum wage violations or counted towards net wages.
Malivuk v. Ameripark, LLC recently restated the general principles at work in an employer's taking of a "tip credit":
the minimum wage that an employer must pay an employee under the FLSA is $ 7.25 an hour. 29 U.S.C. § 206(a)(1)(C). That rule gives way, however, if the employee is a "tipped employee." In that scenario, § 203(m) authorizes the employer to pay the employee (1) an hourly wage of $ 2.13 plus (2) an additional amount in tips that brings the total wage up to the federal minimum wage of $ 7.25 an hour. 29 U.S.C. § 203(m). An employer who utilizes an employee's hourly tips to reach the minimum hourly wage due the employee is said to take a "tip credit." An employer may not take this tip credit, however, unless "all tips received by such employee have been retained by the employee." Id. ("... except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.").
694 F. App'x 705, 706-07 (11th Cir. 2017) (internal footnote omitted). Employers may not take a tip credit (1) "unless such employee has been informed by the employer of the provisions of this subsection, and [ (2) ] all tips received by such employee have been retained by the employee." 29 U.S.C. § 203(m). The burden of showing entitlement to the use of a tip credit lies with the employer. Ash v. Sambodromo, LLC , 676 F.Supp.2d 1360, 1369 (S.D. Fla. 2009) (citing Barcellona v. Tiffany English Pub, Inc. , 597 F.2d 464, 467 (5th Cir. 1979) ).
Section 203(m) is clear that if an employer takes a "tip credit," the amount of tips exceeding the tip credit amount cannot be counted towards the minimum wage. The parties appear to agree that for the vast majority of time in dispute between the parties, Defendants did not use a tip credit to increase the value of their employees' wages above the federal minimum wage, $ 7.25. (See Doc. 235 ¶ 98; Doc. 271 at 18; see also Doc. 235-3 at 58 Saunders Depo. ("Q: Prior to summer of 2016, did ... any of the Team PJ United entities use a tip credit to increase the wages for time spent on the road making deliveries above the federal minimum wage in the states that federal minimum wage is applicable to? A: No".) ) Defendants' Response in Opposition to Summary Judgment appears to make contradictory statements of fact in relation to the amount of tip credit they have taken prior to 2016.[12] The deposition testimony of Saunders that Defendants refer to clarifies that prior to 2016, *1170 Defendants did not pay above the federal minimum wage using the combination of cash wage and tip credit.
There are insufficient facts before the Court on summary judgment to determine the exact tip credit that was given to Defendants' employees, including Sullivan, at all times relevant to the parties' dispute. Under 29 U.S.C. § 203(m), before employers can claim a tip credit for any specific employee, that "employee [must be] informed by the employer of the provisions of § 203(m)." The DOL regulation interpreting the exact pre-requisitional notice requirements for an employer, 29 C.F.R. § 531.59(b), indicates that an employer must specifically tell an employee:
The amount of the cash wage that is to be paid to the tipped employee by the employer; the additional amount by which the wages of the tipped employee are increased on account of the tip credit claimed by the employer, which amount may not exceed the value of the tips actually received by the employee; that all tips received by the tipped employee must be retained by the employee except for a valid tip pooling arrangement limited to employees who customarily and regularly receive tips; and that the tip credit shall not apply to any employee who has not been informed of these requirements in this section.
During his deposition, Saunders identified a 2011 form notice given to delivery drivers, including Sullivan, to fulfill Defendants' statutory perquisite to claiming a tip credit. (Doc. 235-3 at 229.) While Saunders was unsure whether that form notice had been changed subsequent to 2011, it is nonetheless informative for the parties' dispute for the Court to "parse" the amounts stated. The form notice states: "While you are 'on-the-road' and subject to earning tips, you are paid $ 4.00 per hour. [Defendants] take[ ] a tip credit in the amount of the difference between minimum wage and $ 4.00 per hour, not to exceed the value of tips actually received." (Doc. 235-36.) According to the notice, then, a driver would receive $ 4.00 per hour in "cash wages." To find the "tip credit" applied to drivers, the notice states that the cash wage, $ 4.00 per hour, is subtracted from the federal minimum wage, $ 7.25 per hour. This yields an amount of $ 3.25 per hour which constitutes the "tip credit" portion of drivers' wages. In the bounds of this hypothetical, should drivers receive more than $ 3.25 per hour in tips, they would be entitled to retain those tips-but that excess is not counted towards compliance with federal minimum wage requirements because it is not a "tip credit." On the other hand, if a driver receives less than $ 7.25 an hour in cash wage and actual tips, the employer must still pay the driver the difference to ensure the driver receives the federal minimum wage.
To the extent that Defendants may subsequently argue[13] that the amount of tips-in excess of the amount of (1) cash wage and (2) tip credit paid-can be used in a post hoc fashion to offset Sullivan's vehicle costs so that a minimum wage violation does not occur, that argument is foreclosed by § 203(m) and DOL regulations. The purpose of the tip credit reporting requirements is at least partially to ensure that Defendants "go on the record" with the amount of cash wages, tip credit, and non-tip-credit tips. Employers cannot be allowed to retroactively increase or decrease the tip credit amount that counts towards their minimum wage compliance.
*1171 As Perrin v. Papa John's International, Inc. convincingly states:
Although the Plaintiffs do not raise overtime claims in this litigation, the Court agrees with Plaintiffs that the relationship among the FLSA's tip credit, minimum wage, and overtime provisions highlights the importance of the FLSA's tip credit notice requirements. By limiting their tip credit to the difference between Plaintiffs' cash wage and the applicable minimum wage, and so notifying Plaintiffs, Defendants were permitted to similarly limit Plaintiffs' regular rate of pay for overtime purposes to minimum wage. Had Defendants taken a higher tip credit to offset against potential unreimbursed expenses, as they claim the DOL guidance documents allow, this would have increased Plaintiffs' regular rate of pay and, correspondingly, increased the amount Defendants owed Plaintiffs for overtime. Nothing in the DOL guidance documents, regulations, or the FLSA permits Defendants to claim a higher tip credit retroactively, in order to gain the benefit of an offset, without having notified Plaintiffs of the higher tip credit (and the correspondingly higher rate of pay for overtime purposes).
114 F.Supp.3d 707, 729 (E.D. Mo. 2015).
11. WILLFULNESS / RECKLESS DISREGARD
Defendants argue that there is no dispute of material fact and that they are entitled to judgment on the issue of whether the Defendants willfully or recklessly disregarded the FLSA in calculating the reimbursement rate for Sullivan. They state that there is no record evidence showing willfulness, and that all available evidence actually points to Defendants' attempts to comply with the FLSA. Defendants state that they "read the FLSA, read the regulations, read the Field Operations Manual, looked for cases, looked for DOL opinion letters, and consulted counsel" to determine whether they were complying with the FLSA in reimbursing their drivers. According to Defendants, these attempts affirmatively disprove a willful violation or reckless disregard of the FLSA.
"An employer willfully violates the Act if he should inquire as to whether his actions violate the Act, but fails to do so. Davila v. Menendez , 717 F.3d 1179, 1184 (11th Cir. 2013). Davila has described the willfulness inquiry as follows:
The Supreme Court held in McLaughlin v. Richland Shoe Co. , 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988), that a willful violation of the Act occurs when an employer either knows that his conduct is prohibited by or "show[s] reckless disregard for" the minimum wage laws, id. at 133, 108 S.Ct. at 1681. See 29 C.F.R. § 578.3(c)(1). An employer knowingly violates the Act if he disregards the minimum wage laws deliberately or intentionally, McLaughlin , 486 U.S. at 133, 108 S.Ct. at 1681, such as by ignoring "advice from a responsible official ... that the conduct in question is not lawful," 29 C.F.R. § 578.3(c)(2). An employer acts with reckless disregard for the Act if the employer's conduct is more than "merely negligent," McLaughlin , 486 U.S. at 133, 108 S.Ct. at 1681, and is blameworthy "if the employer should have inquired further into whether [his] conduct was in compliance with the Act, and failed to make adequate further inquiry," 29 C.F.R. § 578.3(c)(3) ; see 5 C.F.R. § 551.104. In other words, an employer does not commit a willful violation if he "acts unreasonably, but not recklessly, in determining [his] legal obligation" under the Act. McLaughlin , 486 U.S. at 135 n. 13, 108 S.Ct. at 1682 n. 13.
Davila , 717 F.3d at 1184-85. The burden rests with the employee to "prove by a *1172 preponderance of the evidence" that her employer acted willfully or with reckless disregard. Alvarez Perez , 515 F.3d at 1162-63.
Sullivan first argues that Defendants "had knowledge" that their reimbursements were violative of the FLSA because some employees complained to managers at Defendants' franchises about the reimbursement rate those employees received. Defendants have filed a separate Motion to Strike Declarations (doc. 210), which argues that declarations by certain former Opt-in Plaintiffs to that effect cannot be used because Sullivan did not disclose that these employees intended to testify on complaints to their managers. Sullivan responds that he does not need to specifically disclose that certain former Opt-in Plaintiffs would be testifying about conversations with their supervisors concerning the amount they were reimbursed.
According to Rule 26(a)(1) a party must "without awaiting a discovery request" disclose:
the name and, if known, the address and telephone number of each individual likely to have discoverable information--along with the subjects of that information--that the disclosing party may use to support its claims or defenses, ...
Fed. R. Civ. P. 26(a)(1)(i). Under Rule 26(e), parties must supplement these initial disclosures when they "learn[ ] that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing...." Fed. R. Civ. P. 26(e)(1)(A).
Sullivan argues that his initial disclosures comply with Rule 26. Sullivan's Rule 26 disclosures, made at the time that there was a conditionally certified class, state that:
Mr. Sullivan has knowledge of the factual allegations in the Complaint, including but not limited to the job duties, schedules, and, and expectations of Defendants' delivery drivers.
...
Upon information and belief, the 769 other Opt-In Plaintiffs also have knowledge of the factual allegations in the Complaint, including but not limited to the job duties, schedules, and expectations of Defendants' delivery drivers. They further have information concerning the hours they worked, the rates at which they were compensated, the job-related expenses they incurred, and the amounts they were reimbursed by Defendants for job-related expenses.
(Doc. 250-2 at 2-3.) Sullivan's disclosures do not indicate the former Opt-in Plaintiffs have knowledge about statements made by Defendants' own franchisee managers or the former Opt-in Plaintiffs' complaints about reimbursement rates.
While Rule 26(a)(1)(A)(i) does not require a party to turn over "a minute recitation of the putative witness knowledge," Hammonds v. Jackson , No. 1:13-CV-711-MHS-WEJ, 2015 WL 12867065, at *2 (N.D. Ga. Mar. 16, 2015), report and recommendation adopted , No. 1:13-CV-711-MHS, 2015 WL 12866453 (N.D. Ga. May 18, 2015), disclosures should indicate "briefly the general topics on which such persons have information." Fed. R. Civ. P. 26 advisory committee notes (1993 Amendments, Subdivision (a) ). "The Advisory Committee's reference to 'topics' suggests that the disclosing party must provide more than a perfunctory statement that the identified person has information 'about the case.' " Hammonds , No. 1:13-CV-711-MHS-WEJ, 2015 WL 12867065, at *2 (N.D. Ga. Mar. 16, 2015) (quoting *1173 Lobato v. Ford , No. 05-cv-1437-LTB-CBS, 2007 WL 2593485, at *5 (D. Colo. Sept. 5, 2007) ). The purpose of initial disclosures is to "help focus the discovery that is needed, and facilitate preparation for trial or settlement." Fed. R. Civ. P. 26 advisory committee notes (1993 Amendments). "To these ends, parties should disclose information essential to the proper litigation of all relevant facts, to eliminate surprise, and to promote settlement." Hammonds , No. 1:13-CV-711-MHS-WEJ, 2015 WL 12867065, at *2 (N.D. Ga. Mar. 16, 2015) (quotations omitted).
Sullivan's initial disclosures named all former Opt-in Plaintiffs as potential witnesses but failed to specify that they would seek to testify about complaints to management. Saying that the former Opt-in Plaintiffs have "knowledge of the factual allegations in the Complaint" is a vacant statement unhelpful to focusing the Defendants' discovery efforts. If a statement that the former Opt-in Plaintiffs "know about the civil action" were sufficient under Rule 26(a)(1), then the disclosure requirements themselves would be meaningless. Sullivan's disclosures also indicate that the former Opt-in Plaintiffs have "information concerning the hours they worked, the rates at which they were compensated, the job-related expenses they incurred, and the amounts they were reimbursed by Defendants for job-related expenses." These more specific disclosures likewise do not contain anything indicating that Defendants should have asked the former Opt-in Plaintiffs about complaints to their supervisors.
Sullivan argues that the reasoning in Charvat v. Echostar Satellite, LLC , 2009 WL 2949294 (S. D. Ohio Sept. 11, 2009) is controlling. In Charvat , the defendants sought to introduce an affidavit in support of summary judgment made by a witness that the defendants had not previously disclosed as likely to have discoverable information. Id. , at *1. The plaintiff moved to strike the affidavit, arguing that they were prejudiced by the defendant's failure to specify the affiant as having discoverable information under Rule 26(a)(1). Charvat denied the motion to strike, because the plaintiff was not prejudiced under Rule 37 and already had information that would allow him to determine that the affiant had such information. Id. , at *4. The facts of Charvat differ from this case. The plaintiff there did not seek to take any other depositions in the action, so he likely would not have taken a deposition of the undisclosed affiant-indeed he was not able to articulate what information he would has asked the undisclosed affiant if he was to take the affiant's deposition. Id. , at *2. Here, Defendants not only deposed many of the former Opt-in Plaintiffs, but asked for additional disclosures from the former Opt-in Plaintiffs so that they could better prepare for the depositions. (See Doc. 82.) Defendants had likewise requested leave to depose more than the limited number of Opt-in Plaintiffs they actually deposed; this Court certainly would have permitted Defendants to depose more of the former Opt-in Plaintiffs had Sullivan properly disclosed the above information. The plaintiff in Charvat had knowledge of the affiant's identity because the affiant signed interrogatory responses on behalf of the defendant, thus qualifying for the exception in Rule 26(e)(1)(A) that the "the additional or corrective information has ... otherwise been made known to the other parties during the discovery process or in writing." On the other hand, Sullivan included as allegations in his Complaint that many of the former Opt-in Plaintiffs "frequently complained about Defendants' low reimbursement rates." (Doc. 58 ¶ 46.) Sullivan does not even say who the former Opt-in Plaintiffs complained to. As stated above, the allegations in the Complaint are not sufficient to act as initial disclosures.
*1174 Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." The Court has the authority to exclude the former Opt-in Plaintiffs' affidavits concerning complaints to managers from evidence unless the violation was substantially justified or is harmless. OPSFitel, LLC v. Epstein, Becker & Green, P.C. , 549 F.3d 1344, 1363 (11th Cir. 2008). "Substantial justification is 'justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request.' " Mitchell v. City of Mobile , No. CV 15-0360-CG-C, 2017 WL 1740364, at *2 (S.D. Ala. May 3, 2017) (quoting Hewitt v. Liberty Mut. Grp., Inc. , 268 F.R.D. 681, 682 (M.D. Fla. 2010) ). "A failure to timely make the required disclosures is harmless when there is no prejudice to the party entitled to receive disclosure." Id. (citation omitted) The party failing to comply with Rule 26(a) bears the burden of establishing that its nondisclosure was either substantially justified or harmless. Id.
Sullivan has not shown any substantial justification or that the failure to disclose was harmless. Sullivan argues that there was substantial justification because he included a general allegation in his Complaint that the former Opt-in Plaintiffs "frequently complained about Defendants' low reimbursement rates." Defendants have been deprived the chance to ask about such complaints during depositions, but also from testing the truth of those averments by speaking with the managers to whom the complaints were supposedly made. For these reasons, Sullivan's failure is also not harmless.
This is not the first time that Defendants have objected to Sullivan's disclosure practices. Indeed, Defendants filed a Motion to Compel on March 31, 2017, arguing that Sullivan had disclosed "virtually nothing related to his claims," (doc. 82 at 2), and that Defendants needed disclosures to prepare for the noticed depositions. Sullivan resisted Defendants' Motion, and ultimately the Court did not rule on the parties' specific dispute due to the vast number of discovery disputes in this action. Instead, the Court mooted the Motion following the end of discovery. (See Doc. 281.) Sullivan clearly chose to not make more specific initial disclosures, and must suffer the consequences of not doing so. He cannot now argue the Defendants were not prejudiced when the Defendants so clearly indicated they needed more information to conduct depositions. Thus, Defendants' Motion to Strike (doc. 210) is due to be granted and the affidavits relied upon by Sullivan in opposition to Defendants' Motion for Summary Judgment (docs. 198-1-198-29) are stricken.
Sullivan next argues that if Defendants reviewed the applicable DOL Field Operations Handbook as they purported to have done, they would have known that their reimbursement policy was in violation of the FLSA. Sullivan again points to the DOL Handbook § 30c15 for the proposition that Defendants willfully or recklessly disregarded the FLSA. As the Court has held above, the DOL Handbook is not binding law, but persuasive to the extent that it does not otherwise contradict the FLSA and DOL regulations. Defendants did not "willfully" violate the FLSA by not tracking driver's actual vehicle costs, because tracking of the driver's actual costs is not required under the FLSA. Nor must Defendants reimburse at the IRS rate, but must only reimburse their drivers to the extent that those drivers receive the federal minimum wage.
*1175 During the deposition of Defendants' corporate representative, Saunders explained that Defendants sought to "reasonably approximate the cost of incremental miles of a pizza delivery driver." (Doc. 198-33 at 12.) This included reimbursements for "regular repair and maintenance costs" which factored in costs of driving like oils changes, tire replacements, "brakes, a brake job, windshield wipers, and other general disposables." (Id. at 9-10.) On the other hand, Defendants did not seek in the reasonable approximation of their delivery driver's costs to include financial charges, insurance, or registration costs. (Id. at 12.) Much of the parties' dispute comes down to undecided issues of law in the Eleventh Circuit-such as whether costs of driving like insurance and registration must be reimbursed. Given that there is no clear holding on those issues, the Court cannot say that Defendants' failure to include those costs was a willful or a reckless disregard of the FLSA.
Sullivan also states that Defendants had access to "information showing they were in violation of the FLSA" because Defendant PJ United's franchisor PJI International "was sued in August 2009 for this exact same violation of the FLSA." (Doc. 198 at 25.) PJI settled that lawsuit. See Order Granting Final Approval of Class Action Settlement, Perrin v. Papa John's International, Inc. , Case No. 09-01335-AGF (E.D. Mo. Jan. 12, 2016). PJI's settlement, in a different judicial district, does not have any bearing on whether Defendants willfully violated the FLSA through their vehicle reimbursement methodology.
Since Sullivan has not shown that Defendants acted willfully or recklessly, the appropriate statute of limitations is two rather than three years as to Sullivan's FLSA claims. The Court emphasizes that this holding extends to Sullivan alone, and should not be construed as reaching the other former Opt-in Plaintiffs that have been dismissed prior to the entry of this Memorandum of Opinion.
V. CONCLUSION
As stated more fully above, Defendants' Motion to Strike Plaintiffs' Declarations filed in Opposition to Summary Judgment (doc. 210) is due to be GRANTED; Sullivan's Consolidated Motion for Summary Judgment (doc. 235) is due to be GRANTED in PART and DENIED in PART; Defendants' Motion for Summary Judgment (doc. 269) is due to be GRANTED in PART and DENIED in PART; and Sullivan's Motions to Strike is due to be DENIED as MOOT (docs. 275 & 277).
DONE AND ORDERED ON JULY 19, 2018.

Sullivan originally filed seven separate motions for summary judgment, each encompassing a single discrete issue. (See Docs. 219-225.) The Court directed Sullivan to consolidate these motions into a single pleading, which he did. (Doc. 235.) Thus, Sullivan's originally filed motions (docs. 219-225) are MOOT.

The facts set out in this Portion are gleaned from the parties' motions for summary judgment. The Court "view[s] the materials presented and all factual inferences in the light most favorable to the nonmoving party."Animal Legal Def. Fund v. U.S. Dep't of Agric. , 789 F.3d 1206, 1213-14 (11th Cir. 2015) (citing Adickes v. S.H. Kress & Co. , 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ). Because the parties' Motions at some points move for summary judgment on the same issue, it is impossible for the Court to recount all facts in the light most favorable to the nonmoving party. Thus, the Court briefly recounts a general background of this action and pertinent facts. In the discussion section below, the Court will indicate where necessary the material facts taken in the light most favorable to the nonmoving party.

Bonner v. City of Prichard , 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981).

The basic requirements of this section show why Defendants' argument concerning who is in the best position to keep certain documents is not material. Many of the base requirements, such as the employee's current address, is best known to the employee. Yet § 516.2(a) still requires that the employer keep that information and does not delegate it to the employee.

29 C.F.R. § 516.27 provides in pertinent part: "(a) In addition to keeping other records required by this part, an employer who makes deductions from the wages of employees for "board, lodging, or other facilities" (as these terms are used in sec. 3(m) of the Act) furnished to them by the employer or by an affiliated person, or who furnishes such "board, lodging, or other facilities" to employees as an addition to wages, shall maintain and preserve records substantiating the cost of furnishing each class of facility except as noted in paragraph (c) of this section. Separate records of the cost of each item furnished to an employee need not be kept."

Section 531.32(a) provides in full:
"Other facilities," as used in this section, must be something like board or lodging. The following items have been deemed to be within the meaning of the term: Meals furnished at company restaurants or cafeterias or by hospitals, hotels, or restaurants to their employees; meals, dormitory rooms, and tuition furnished by a college to its student employees; housing furnished for dwelling purposes; general merchandise furnished at company stores and commissaries (including articles of food, clothing, and household effects); fuel (including coal, kerosene, firewood, and lumber slabs), electricity, water, and gas furnished for the noncommercial personal use of the employee; transportation furnished employees between their homes and work where the travel time does not constitute hours worked compensable under the Act and the transportation is not an incident of and necessary to the employment.
29 C.F.R. § 531.32(a).

Defendants make this argument in their briefing in regards to the former Opt-in Plaintiffs as a class. The Court does not rule on the evidentiary sufficiency in regards to all former Opt-in Plaintiffs. However, as Defendants only make arguments on a class-wide basis and have not presented arguments specific to Sullivan, the Court has no means of assessing the evidentiary sufficiency of Sullivan's case, except as a member of the former class.

Defendants had previously filed a Motion to Preclude Paul Lauria from Testifying (doc. 195), which the Court ordered briefed. Subsequent to that Motion and a protracted dispute between the parties and non-party PJI International, Inc., the Court ordered that Sullivan be given access to the data contained in the Checkout Reports that were in the possession of PJI International, Inc. (doc. 217). On November 27, 2017, the Court held Defendants' Motion to Preclude was moot, (doc. 232), as Sullivan was given leave to file a new version of his expert report using complete data that he had been seeking from Defendants for the previous year. Defendants have not renewed their challenge to Sullivan's use of the expert report.

Indeed Defendants' argument is difficult to understand considering the multiple motions and months of arguments, with multiple telephone conferences and hearings wherein Defendants fought to receive interrogatory responses from the former Opt-in Plaintiffs.

Sullivan makes the disingenuous argument that Defendants' § 260 argument should be dismissed because the Defendants characterized the issue as "unripe." (Doc. 256 at 49 ("[P]ursuant to Defendants' admission that their affirmative defense 'is not ripe' that affirmative defense should be dismissed.") (citation omitted) ). No reasonable reader viewing Defendants' argument would understand Defendants as asking for dismissal of their own affirmative defense. Defendants use of "ripeness" in context plainly asks this Court to forbear deciding the § 260 defense until liability has first been proved. (See Doc. 271 at 41) ("The issue of liquidated damages does not arise until a finding of liability has been made. [Sullivan]'s motion for summary judgment is facially theoretical at this point, and the issue of liquidated damages, if it is to be considered at all by the Court, is not ripe.").

Defendants are required under § 516.2(a)(1) as employers to "maintain and preserve payroll or other records containing ... with respect to each employee" the employee's name and identifying number.

Sullivan's Undisputed Fact 98 states "Before the summer of 2016, which covers the vast majority of the recovery period, Defendants never used a tip credit to increase the wages of their delivery drivers above the minimum wage in states where in which the federal minimum wage applies." (Doc. 235 ¶ 98.) In response to Undisputed Fact 98, Defendants states: "Admitted that prior to summer of 2016 no operating company defendant took a tip credit to increase the wages of a Delivery Driver above the minimum wage but denied that the combination of cash wages paid and tip credit taken was limited to $ 7.25 per hour.... (Doc. 271 at 18.) Parsing this statement into its two constituent parts yields diametrically opposed responses: (1) "[P]rior to summer of 2016 no operating company defendant took a tip credit to increase the wage of a Delivery Driver above the minimum wage" and "denied [to the extent] the combination of cash wages paid and tip credit taken was limited to $ 7.25 per hour." The first statement plainly asserts that prior to 2016 Defendants' cash wage with tip credit did not exceed the federal minimum wage; the second then appears to argue that the cash wage with tip credit did exceed minimum wage. (See also Doc. 271 at 18 (responses 98 and 100).)

Defendants have made no argument in their Response in Opposition to Summary Judgment in regards to this issue.